USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

136 FIELD POINT CIRCLE HOLDING COMPANY, LLC,

Plaintiff,

-against-

ALEXANDER RAZINSKI, et al.,

Defendants.

21-CV-11076 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff 136 Field Point Circle Holding Company, LLC ("Plaintiff") brought this action against Defendants Alexander Razinski and Tanya Razinski (the "Razinskis") and Invar International Holdings Inc. ("Invar"), asserting contractual claims arising from a real estate agreement. The Court entered summary judgment in favor of Plaintiff on the issue of liability and subsequently held an evidentiary hearing on the issue of damages. Based on the evidence adduced at that hearing, and for the reasons explained below, the Court awards damages against the Razinskis, jointly and severally, in the amount of $31,333,961.50, plus pre- and post-judgment interest on that amount, to be calculated by the Clerk of Court.

## BACKGROUND

This action concerns a residential property located at 136 Field Point Circle in Greenwich, Connecticut (the "Property"), which Plaintiff once owned and where the Razinskis once resided. The case is part of a long-running series of disputes between the same parties over the same Property and related agreements. Multiple prior decisions by judges of this Court have thoroughly chronicled the saga. The Court incorporates by reference the recitation of the

relevant factual background and procedural history provided in its summary judgment decision dated March 4, 2025. *See* Dkt. No. 115 ("SJ Opinion").

Plaintiff filed this action on December 27, 2021, bringing a claim against the Razinskis and Invar (a corporation wholly owned by the Razinskis and their daughter) for breach of contract in connection with a set of legal arrangements governing the occupancy, financing, and sale of the Property. Plaintiff and the Razinskis entered into a written agreement whereby the Razinskis would lease the Property and retain an option to purchase it outright. *See* Pl.'s Ex. 1 ("Master Agreement").[1] If the option expired before being exercised, Plaintiff had the right to sell the Property, and the Razinskis would be obligated to cover any deficit between the cash proceeds of the sale (the "Sale Proceeds") and a contractually defined "Required Return Price."[2] Master Agreement at 5. In the SJ Opinion, the Court granted summary judgment for Plaintiff on the issue of liability, holding, *inter alia*, that Plaintiff was entitled to a deficit payment and that the Razinskis breached the Master Agreement by failing to make that payment. SJ Opinion at 23–24. The SJ Opinion did not address the precise amount of the deficit between the Sale Proceeds and the Required Return Price—*i.e.*, the damages for Plaintiff's contract claim—except to the extent required to determine that a deficit existed. *See id.* at 12.

On April 28, 2025, the Court set a schedule for submissions on the issue of damages. *See* Dkt. No. 128. That same day, the Razinskis requested that the Court hold an evidentiary hearing. *See* Dkt. No. 130. Plaintiff filed Proposed Findings of Facts and Conclusions of Law on May 19, 2025, *see* Dkt. No. 136 ("PFFCL"), and the Razinskis filed their response on June 15, 2025, *see*

[1] Exhibit citations refer to the exhibits admitted at the December 3, 2025 evidentiary hearing.

[2] The Master Agreement provided that if the Sale Proceeds exceeded the Required Return Price, Plaintiff would make a defined payment to the Razinskis. However, in deciding liability, the Court has already determined that the Sale Proceeds were less than the Required Return Price. *See* SJ Opinion at 12–17.

Dkt. No. 143 ("Opposition" or "Opp."). After reviewing the parties' submissions, the Court determined that the only outstanding factual dispute with respect to damages was "whether Plaintiff deliberately sold the Property below its fair market value and thus failed to mitigate its damages in some amount." Dkt. No. 155 at 7. The Court held an evidentiary hearing on that narrow issue on December 3, 2025. *See* Dkt. No. 173 ("Hr'g Tr."). Plaintiff called Nicholas Prouty, managing member of Plaintiff, and he was also cross-examined by Mr. Razinski. Defendants called Xenia Razinski, Defendants' daughter, primarily to authenticate a number of exhibits. *Id.* On December 12, 2025, the parties submitted post-hearing letters with their final written arguments. *See* Dkt. Nos. 171, 172.

## DISCUSSION

## I. LEGAL STANDARD

Where a federal court exercises diversity jurisdiction, state law provides the proper rule for calculating damages. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996).[3] New York law governs this case. *See* SJ Opinion at 6; Master Agreement at 15. "It is well established that to recover damages from a breach of contract under New York Law, the damages 'must be reasonably certain' and not 'speculative, possible, or imaginary.'" *Bell v. Koss*, No. 17-CV-07762 (AT) (VF), 2024 WL 3949340, at *2 (S.D.N.Y. Aug. 27, 2024) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007)). In this context, the certainty requirement "refers to the *fact* of damage, not the amount." *Tractebel Energy*, 487 at 110. Once the fact of damages is established, "[t]he plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Id.*

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

## II. PLAINTIFF'S CLAIMED DAMAGES

Plaintiff seeks contractual damages equal to the difference between the Required Return Price and the Sale Proceeds (the "Deficit"), plus interest on that amount from November 30, 2021. *See* PFFCL ¶ 29. To calculate damages, the Court must therefore determine both the Required Return Price and the Sale Proceeds, and then perform simple arithmetic to determine the Deficit.

### A. Required Return Price

The Master Agreement defines "Required Return Price," in relevant part, as the sum of:

(1) $16,000,000, plus

(2) the product of $233,333 times the number of calendar months between the Real Estate Closing Date and [Property] sale date (but not less than $1,400,000), plus

(3) the product of $25,000 times the number of calendar months between the Real Estate Closing Date and the [Property] sale date, minus the aggregate rental payments paid by the Razinskis to [Plaintiff] with respect to the [Property] (but not less than $150,000), plus

(4) $2,500,000, plus

(5) the cost of any (I) premiums and deductible payments on any property insurance policies maintained on the [Property], (II) homeowners' association or similar dues or fees on the [Property], (III) property taxes on the [Property] not paid from the Razinskis-funded escrow described in Section 2.2 and (IV) other out-of-pocket costs incurred by [Plaintiff] in maintaining the Property between the Real Estate Closing Date and [Property] sale date, plus

(6) the amount of any real estate sales commissions, transfer taxes and other costs and expenses payable by [Plaintiff] in connection with its sale of the [Property] (it being acknowledged that no such real estate sales commission shall be due upon repurchase of the [Property] by the Razinskis from [Plaintiff] upon exercise of the Call Option or the Put Option), minus

(7) the amount of any Arbitration Proceeds and/or Invar Business Proceeds received by [Plaintiff.]

Master Agreement § 12(a). There are no bona fide disputes as to the value of any of the seven components of the Required Return Price formula:

(1) The first value is fixed by the Master Agreement at $16,000,000.

(2) The second value equals $26,599,962 because there are 114 calendar months between the Real Estate Closing Date (May 17, 2012) and the Property sale date (November 30, 2021). The product of 114 and $233,333 is $26,599,962. PFFCL ¶¶ 19–22; Dkt. No. 137 ("Griffiths Decl.") ¶¶ 14–17. The Razinskis do not dispute that May 17, 2012, and November 30, 2021, are the applicable dates for purposes of this calculation, or that those dates are separated by 114 months. *See* Opp. at 9. Their only objection is that Plaintiff "cannot claim interest for all those months as a matter of law." *Id.* That legal issue has already been decided by the Court, which previously recognized that "the unambiguous terms of the Master Agreement . . . require[] a calculation of 'the number of calendar months between the Real Estate Closing Date and Property sale date.'" SJ Opinion at 17.

(3) The third value equals $0 because Plaintiff waives any amount it may be owed under the third clause of the Required Return Price definition. PFFCL ¶ 23. The Razinskis do not contend that the value is negative, such that it would lessen the damages owed. They argue only that the amounts defined by the third clause "are illegitimate and should never have been included in the first place," Opp. at 10, which is both irrelevant at this stage and moot given Plaintiff's waiver.

(4) The fourth value is fixed by the Master Agreement at $2,500,000.

(5) The fifth value equals $0 because Plaintiff waives any amount it may be owed under the fifth clause of the Required Return Price definition. PFFCL ¶ 23. The Razinskis do not contend that the value is negative, such that it would lessen the damages owed. They argue only (and inappositely) that the amounts defined by the fifth clause "are illegitimate and should never have been included in the first place." Opp. at 10. Again, even if this objection was relevant, it is mooted by Plaintiff's waiver.

(6) The sixth value equals $914,074.20 because Plaintiff proffers that the total real estate commission, taxes, and other related costs of the sale of the Property, which Plaintiff paid, equals $914,074.20, *see id.* ¶ 24; Griffiths Decl. ¶ 19, which corresponds to the total disbursements listed on the closing statement for the sale of the Property, *see* Pl.'s Ex. 6 ("Closing Statement"). The Razinskis "reject this calculation because claiming interest for the time it chose to wait to sell the property for is a violation of the covenant of good faith and fair dealing and cannot be enforced as a

matter of law." Opp. at 10. Their argument is inapposite because the disbursements referenced in this provision are completely unrelated to interest payments. *See* Closing Statement (listing taxes, utilities, caretaker costs, broker commission, legal fees, and other administrative costs). The Razinskis have not disputed the factual bases for the costs claimed under the sixth clause.

(7) The seventh value equals $0 because Plaintiff proffers that it "never received any monies from the Defendants representing 'Arbitration Proceeds' and/or Invar Business Proceeds," PFFCL ¶ 25; Griffiths Decl. ¶ 20. The Razinskis contend that they "never owed arbitration proceeds" in the first place. Opp. at 10. That purported fact is irrelevant for purposes of calculating the Required Return Price. It is undisputed that the amount of the seventh value component is $0.

Accordingly, Plaintiff has shown that the Required Return Price equals $16,000,000 + $26,599,962 + $2,500,000 + $914,074.20. That total is $46,014,036.20.

**B. Sale Proceeds**

The Master Agreement does not further define "cash proceeds from the sale of the Property." Plaintiff sold the Property for a gross price of $14,500,000. *See* Closing Statement; *see also* SJ Opinion at 7. After various credits and disbursements, Plaintiff received net proceeds of $13,532,607.90 from the sale. *See* Closing Statement. In its Proposed Findings of Fact and Conclusions of Law, Plaintiff calculates the Deficit based on the difference between the Required Return Price and the gross sales price. *See* PFFCL ¶¶ 12, 27. However, in briefing its summary judgment motion, Plaintiff appears to have assumed that the calculation instead depends on the *net* proceeds of the sale. *See* Dkt. No. 78 at 13. Using the gross sales price results in a smaller Deficit and thus reduces the damages recoverable by Plaintiff. The Court construes Plaintiff's change in position as a concession that the gross sales price is the applicable

figure as a matter of law.[4] The Sale Proceeds therefore total $14,500,000, as shown on the Closing Statement.

**C. Deficit**

The Deficit is the difference between the Required Return Price and the Sale Proceeds, or $46,014,036.20 minus $14,500,000. That difference is $31,514,036.20. Plaintiff's submissions state that $46,014,036.20 minus $14,500,000 instead equals $31,567,294.50, which is plainly wrong as a matter of arithmetic. *See* PFFCL ¶ 27; Griffiths Decl. ¶ 22. The erroneous value represents Plaintiff's (unsuccessful) attempt to correct a computational error from its summary judgment submissions, which had produced a different erroneous value of $31,333,961.50. *See* Griffiths Decl. at 5 n.1; Dkt. No. 94 ¶ 14. "For the sake of simplicity," Plaintiff consents to deeming the Deficit to equal $31,333,961.50, the lowest of the three values (one correct and two incorrect) in the record. *See* Griffiths Decl. at 5 n.1. Accepting Plaintiff's concession does not prejudice the Razinskis; indeed, it benefits them by expunging $180,074.70 in damages that the Court would have otherwise found to be well supported. Accordingly, the Court accepts $31,333,961.50 as the amount of the Deficit, which is the amount of Plaintiff's contractual damages.

**D. Interest**

**1. Pre-Judgment Interest**

In a diversity case, pre-judgment interest is governed by state law. *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). Under New York law, a party is entitled to recover pre-

[4] In any event, the Court believes this revised position is correct, because the sixth value component of the Required Return Price, set forth above, adds back the costs of sale that are the difference between the gross and net proceeds. Were it otherwise, the Razinskis would effectively be billed twice for the costs of sale, which would not be appropriate absent an express contractual agreement to such a calculation.

judgment interest on a sum awarded due to breach of contract at a rate of nine percent per year from "the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. §§ 5001, 5004; *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991) ("Under New York law . . . a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right."). Here, the earliest ascertainable date when Plaintiff had a claim for breach of contract is December 6, 2021. *See* Master Agreement § 6.3 (requiring Deficit payment to me made within five days of the closing of the sale of the Property); Closing Statement (showing the sale of the Property closed on November 30, 2021).

#### 2. Post-Judgment Interest

"In this Circuit, an award of post-judgment interest is mandatory on any money judgment in a civil case recovered in a district court." *42West LLC v. Gould*, No. 21-CV-01581 (OTW), 2024 WL 4345572, at *13 (S.D.N.Y. Sept. 30, 2024). Section 1961(a) provides for post-judgment interest "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961(a).

* * * * * * * * * * * * * * * * * * * * * * *

In light of the above, damages are reasonably certain, and Plaintiff has shown a stable foundation for a reasonable estimate[5] of contractual damages of $31,333,961.50, plus post-judgment interest and pre-judgment interest from December 6, 2021.

## III. MITIGATION OF DAMAGES

The Razinskis dispute that they owe damages at all, asserting that Plaintiff instead owes them over $500 million. *See* Opp. at 19. Of course, liability has already been decided in favor

[5] As noted, the Court also finds that the amount of damages is reasonably certain.

of Plaintiff, so the Razinskis' position is meritless. To the extent that portions of the Razinskis' arguments against liability are relevant to the determination of damages, the Court previously rejected most of their unfounded theories as a matter of law. *See* Dkt. No. 155 at 6–7 (summarizing the Court's prior decision with respect to various arguments that the Razinskis raised at the summary judgment phase, which they have repeated at the damages phase).

The one exception is the Razinskis' argument that Plaintiff deliberately sold the Property below its fair market value. Pointing to supposed anomalies surrounding the sale, the Razinskis contend that Plaintiff sold the Property to a "straw buyer" for an artificially deflated price, thereby increasing the Deficit for the purpose of maximizing Plaintiff's damages under the Master Agreement. *See* Opp. at 7–8; 13. The Court construes that argument to raise a factual dispute implicating Plaintiff's duty to mitigate its damages. *See* Dkt. No 155 at 7.

**A. Applicable Law**

The plaintiff in a breach of contract action "ordinarily has a duty to mitigate the damages that he incurs." *Tang Cap. Partners, LP v. BRC Inc.*, No. 22-CV-03476 (RWL), 2024 WL 4716315, at *36 (S.D.N.Y. Nov. 8, 2024). The duty to mitigate "applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010). That standard "requires only reasonable, practical care and diligence, not extraordinary measures." *Id.* "While the plaintiff is required to mitigate damages upon breach, the burden of proving a lack of diligent effort to mitigate damages is upon the defendant." *Ocean Wide Logistics Inc. v. Power Train Components, Inc.*, No. 18-CV-05666 (NG)(RML), 2021 WL 9566361, at *2 (E.D.N.Y. Apr. 12, 2021) (quoting *Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 74 (N.Y. 1966)). "In addition, the defendant must show the extent to which such efforts would have reduced plaintiff's damages." *Id.* Whether a plaintiff has made reasonably diligent efforts to

mitigate damages is a question of fact. *Of A Feather, LLC v. Allegro Credit Servs., LLC*, No. 21-0960, 21-1107, 2023 WL 2415607, at *1 (2d Cir. Mar. 9, 2023).

**B. The Evidentiary Hearing**

On December 3, 2025, the Court held an evidentiary hearing solely on the issue of mitigation of damages, or "whether the plaintiff in connection with the sale of the property unreasonably failed to take the steps necessary to sell the property at a reasonable price." Hr'g Tr. at 8:23–9:4. In view of the arguments advanced by the Razinskis, the hearing largely concerned "the legitimacy of the [sale] process and the efforts the plaintiff undertook to sell the property for the maximum reasonable price available." *Id.* at 9:5–7.

The sole fact witness at the hearing was Nicholas Prouty, Plaintiff's managing member. *See* Hr'g Tr. 10:2–4. Prouty had the authority to make decisions for Plaintiff regarding the purchase and sale of the Property at all relevant times, including whether to accept or reject offers. *Id.* at 10:11–15, 27:5–9. He testified to the facts and circumstances surrounding the Master Agreement and the eventual sale of the Property. The Court found Prouty well-informed and highly credible. The following are the Court's findings of fact on the question of mitigation of damages, supported by Prouty's testimony.

On behalf of Plaintiff, Prouty purchased the Property in 2012 for approximately $13 million. Hr'g Tr. at 39:9–20. The purchase was part of the deal memorialized by the Master Agreement, whereby the Razinskis could continue to reside in the Property and retained an option to purchase the Property at a later point. *Id.* at 11:1–7. The Razinskis' option would expire no later than 18 months after Plaintiff's purchase of the Property had closed. *See* Master Agreement §§ 1.3, 3.1. If the Razinskis did not exercise their option, they would have to vacate the Property, and Plaintiff would have the option to list the Property for sale. *See id.* §§ 2.3, 6.1; Hr'g Tr. at 11:8–11. Under the Master Agreement, Plaintiff was required to consult with David

Ogilvy & Associates ("Ogilvy"), a real estate firm, to list the Property for an initial price between $20,000,000 and $30,000,000. *See* Master Agreement § 6.1. However, Plaintiff retained the sole and absolute discretion to subsequently reduce the sales price and to accept or reject any purchase offer. *Id.*; *see also* Hr'g Tr. at 33:3–34:4.

The Razinskis ultimately did not exercise the option, and it expired in November 2013. For several years they refused to vacate the Property in accordance with the Master Agreement, necessitating their forcible eviction by the sheriff in 2018. Hr'g Tr. at 12:13–13:1. After their eviction, the Razinskis initiated a course of litigation in connection with the Property and filed notices of *lis pendens* that effectively prevented any sale. *Id.* at 13:8–15. In December 2019, once all *lis pendens* had been removed, Prouty met with Ogilvy to begin the process of listing the Property for sale. *Id.* at 14:14–15:5. However, the Property was not publicly listed until June 2020, when Plaintiff entered into a $20 million listing agreement with Sotheby's International Realty ("Sotheby's"), the successor firm to Ogilvy. *Id.* at 15:6–16:4; PX 1. The delay in listing the Property was caused in significant part by the intervening COVID-19 pandemic, which resulted in travel and construction restrictions that impeded Plaintiff's efforts to prepare the Property for sale. Hr'g Tr. at 16:23–17:17; *see also id.* at 55:11–23 (Martha Jeffrey, a real estate agent from Sotheby's, had advised that that certain repairs and other work were necessary before the Property could be placed on the market.).

In July 2020, Plaintiff received an offer to purchase the Property for $18,750,000. *Id.* at 17:19–18:15; Pl.'s Ex. 3. For reasons unknown to Prouty, the purchase fell through. Hr'g Tr. at 18:16–22. Having received no further purchase offers, Plaintiff twice lowered the Property's listing price based on the recommendations of the listing brokers at Sotheby's. *See id.* at 18:23–19:22. Then, on September 23, 2021, Plaintiff received an offer of purchase from an entity

("Purchaser") controlled by Israel Englander, a prominent hedge fund manager. *See id.* at 19:23–20:11; 26:10–13; Pl.'s Ex. 4. The initial offer was for $15,750,000, Hr'g Tr. at 20:22; Pl.'s Ex. 4, but owing to perceived defects in the Property, Plaintiff and Purchaser ultimately signed a sales contract for $14,500,000. Hr'g Tr. at 23:11–13; Pl.'s Ex. 5. Prouty agreed to the price reduction because he valued an immediate sale more than the prospect of receiving a higher price at some uncertain future date, especially given that the ongoing costs of owning the Property (including taxes and maintenance) had become burdensome. Hr'g Tr. at 23:20–24:4. The transaction closed on November 30, 2021.

The sale was an arm's length transaction. Prouty is not related to Englander, and he had no business affiliations with Purchaser or any other companies controlled by Englander. Hr'g Tr. at 26:5–27:3. Plaintiff did not retain any rights in the Property after its sale. *Id.* at 26:23–25. Plaintiff and Purchaser were represented by attorneys from the same law firm, but the parties signed a conflict waiver acknowledging the relationship, and there is no evidence whatsoever that the attorneys' allegiances were misplaced or that the interests of their clients were interdependent. *See id.* at 59:6–60:1. The Razinskis' contention that Englander was a straw buyer is mere speculation unsupported by any evidence (and highly implausible, given the record evidence of Englander's status as a prominent hedge fund manager who apparently still owns the Property). The Razinskis' various other theories of impropriety in the sale process likewise have no support in the record. There is simply no competent evidence to show that the sale was a sham, that it involved self-dealing, or that it was anything other than an arm's length transaction overseen by independent real estate professionals.

Moreover, Plaintiff acted reasonably to secure the greatest economic value from the Property. Despite the Razinskis' assertions that the listing failed to showcase the true value of

the Property, such as by using unflattering pictures,[6] the record reflects that Plaintiff worked with Sotheby's to maximize the Property's marketability. *See, e.g.*, Hr'g Tr. at 42:13–15; 45:2–15; 46:2–10; 55:16–23. In addition to a lack of evidence, the Razinskis' suggestions that Sotheby's deliberately showed the Property in an unfavorable light are belied by the fact that the firm's commission-based compensation incentivized it to achieve the highest possible sales price. *See* Hr'g Tr. at 42:18–43:7. Crucially, Plaintiff had similar motives. It is true that, on paper, Plaintiff potentially stood to gain from the Razinskis' breach of the Master Agreement. But given Plaintiff's view that the Razinskis were and are effectively judgment-proof, Plaintiff had little incentive to artificially deflate the sales price in order to secure a higher judgement against the Razinskis because Prouty fully expected at the time of the sale that Plaintiff would be unable to collect on such a judgment anyway. Hr'g Tr. at 27:11–28:5. Indeed, Plaintiff already has multiple judgments against the Razinskis that have never been paid. *See, e.g.*, Pl.'s Ex. 7; Hr'g Tr. at 27:21–24, 30:2–5. Plaintiff's economic incentives were instead to "get the highest price [it] possibly could for a house so that [it] could recoup some of the funds that [it] invested in the deal." Hr'g Tr. at 27:24–28:1; *see also id.* at 53:25–54:2 ("[G]iven the fact that the Razinskis were fighting me at every moment, I felt the best way to realize money was to sell the house."). Plaintiff's conduct in listing and selling the Property was consistent with that economic motive.

Accordingly, the Razinskis fall far short of their burden to show a lack of diligent efforts by Plaintiff to mitigate its damages, let alone their burden to show any amount by which Plaintiff failed to mitigate. The Court finds that Plaintiff acted reasonably diligently to sell the Property for a favorable price through a legitimate transaction.

---

[6] The Court does not agree that the listing photos chosen by Sotheby's were unflattering or unappealing. In any event, prospective purchasers were able to view the Property in person. Hr'g Tr. at 46:2–10.

## CONCLUSION

For the foregoing reasons, Plaintiff is awarded damages in the amount of $31,333,961.50; pre-judgment interest at the statutory rate from December 6, 2021, to the date of judgment as calculated by the Clerk of Court; and post-judgment interest beginning when the Clerk of Court enters judgment.

The Clerk of Court is respectfully directed to enter judgment for Plaintiff, as set forth above, and CLOSE this case.

Dated: September 30, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge